118-2387, City of Chicago Heights v. Alberto Gallo May it please the Court of Counsel, my name is Robert Lutino. I represent the opponents of the City of Chicago Heights. Well, here's an interesting case. There's more here than your typical voter manifest way to review. Every doctor who's testified in this case has testified that osteoarthritis has no known cause. It progresses on its own. It progresses on its own regardless of trauma. Now, in this particular case, your colleague is chasing a suspect. He's running out on you, and you're out. And he twists it rightly, and he gets an unreasonable scare. It's important to note that one year before, in 2014, he also has a meniscus tear in his right knee. He has arthrostatic surgery. He recovers, goes back to work. After the September 22, 2014 accident, he eventually comes under the treatment of Dr. Jimenez. Dr. Jimenez performed arthrostatic surgery a few months later, December 11, 2015. What's interesting to note is in the operative report, Dr. Jimenez says your colleague is bone-on-bone in the right knee. And as you know, bone-on-bone is a term of art. If you take a look at a chicken bone, if you look at the end of the bone, you'll see there's a white, slippery substance. That's the articular cartilage. And when you have osteoarthritis, that articular cartilage is wearing away over a long period of time. So you're saying stepping into this hole, this accident that he sustained, could not have aggravated or exacerbated his preexisting condition? No, it did not. That's what Jimenez said, right? Jimenez gave that opinion. I'm sorry? Jimenez gave that opinion, didn't he? Dr. Jimenez gave that opinion, and it's the basis of his opinion. He said, I'm relating his need for a total knee replacement three years later to this knee lumeniscus tear on September 22, 2015, because he was pain-free prior to September 22, 2015. The problem is that's just simply not the case. Did he take any time off work? Was he on a medication? No, he did not get treatment. He did not lose any time from work that we could detect from the record. However, he did testify, yes, I have had on and off pain and aching in my right knee for the year prior to the accident. When the accident occurred on September 22, 2015, he goes in the emergency room at Ingalls, and he's seen by Dr. Ishtar, and he gives that same mystery to his initial treating medical providers. He says to Dr. Ishtar, I have had on and off pain and aching in my right knee for the year prior to the accident. Let me just quote this from the commissions, and I want to pin you down on it. The commission specifically found that regardless of when the claimant was bone-on-bone, as you've argued, regardless of that, the record supported that his preexisting degenerative knee condition was aggravated or accelerated by the September 22, 2015 work accident. So they heard the argument, they acknowledged it, and they said you're wrong because there was still an aggravation, acceleration, and exacerbation. So tell us why they can't come to that legitimate legal conclusion. Well, because it's contrary to the district court's decision in Sysco, and the facts of Sysco and this case are almost identical. In both cases, you have an employee who has preexisting osteoarthritis. They get a meniscus care. It's repair and shave, repair and arthroscopic. In Sysco, one month later after he returns to work, a month later he goes to the doctor and says, my knee's bothering me again. And the doctor says, well, that's because you have non-occupational end-stage osteoarthritis. You need a knee replacement. And the commission said, well, everybody knows that the meniscus is different than the articular cartilage. And shaving a meniscus is a different procedure than the wearing away of articular cartilage. And nobody gets a knee replacement because of a meniscus tear. And that eventually went on review, and this court affirmed that. The commission got it right in Sysco. The commission got it wrong here. It's a different panel. And what the commission failed to do in this case is follow your decision in Sysco. And your Sysco case was not a Rule 23 decision. It was a reported decision. And the analysis in Sysco is exactly the analysis they should have used. So what is the rule that comes out of Sysco in your opinion? Announce the rule that applies to this case that you're reporting from Sysco. Meniscus is different than articular cartilage, just like Dr. Carlson said. There are different structures, different treatment, different causes, different symptoms. What does that have to do with whether or not the work accident aggravated his preexisting condition? Well, that has everything to do with whether the work accident aggravated his preexisting condition. He's got no doctor said that he didn't have a preexisting condition. There's no one. No, the claimant did testify today. Yeah. We already know that. No question. He's got osteoarthritis. No known cause of progressive thymus, no massive leg trauma. In fact, the December 6, 2016 X-ray showed he's got instant osteoarthritis in both knees, the left knee and the right knee. Well, let's get to the question. Let's get to the question. Answer the question. So what? Okay. I'm sorry. I lost track. Yeah. Who was you? My question was the rule in Sysco that you have alleged controls this case. What is the rule? The rule is a medical meniscus is different than osteoarthritis. What are you saying? That is the rule. Sysco said that they're different structures. What is the structure and the nature of it have to do with the preexisting condition being aggravated by the work accident? There's two principles that generally apply. Isn't it true that the employer takes the employee as they find them, quote, unquote, and that to be compensable, the accident need not be the sole or even the principal cause, as long as they cause it to factor? So why don't those rules apply here? Well, that's also correct. But what you have here is you can have you take a close look at the facts of this particular case, and this gentleman had three x-rays. He had one September 25, 2015, three days after the accident. He has another one in November, a couple of weeks after the accident. They don't show a progression. It's not until he has the- A progression of what now? Of the osteoarthritis. Right. Okay. It's not until 14 months later that he has an x-ray December 6, 2016, and Dr. Carlson looks at all three of these x-rays and says, well, he doesn't have a progression until this 2016 x-ray. Doesn't that help his case? I'm sorry? Doesn't that help his case that something happened that caused this? Well, that's the nature of osteoarthritis. He's got the same condition in his unaffected left knee. The problem is he has a meniscus tear. No question about that. But how would that meniscus tear aggravate the preexisting osteoarthritis when he's already bone-on-bone when he had the surgery? What about his testimony that was unimpeached? He returned to full duty work after this meniscus tear you refer to. 2014 or 2015? 2014, he returned to work. That's correct. Did not seek any medical treatment for a doctor for his knee, did not miss any work because of his knee, did not take any medication for his knee, was working full duty as a police officer without problems of any type of kind. And then he has the accident? And you're saying the accident had nothing to do with his resulting condition? That's correct. And there are two reasons here. Number one, under cross-examination, you can have your osteoarthritis progressed and be asymptomatic. That's exactly what happened here. In fact, his condition was so advanced he was not asymptomatic. But what you're calling asymptomatic, the other side would say that was an aggravation of a preexisting condition. That's why it went from asymptomatic to being an aggravated condition. Well, the aggravation in order for osteoarthritis to be aggravated, the articular cartilage has to be wore away. A meniscus does not wear away articular cartilage. See, that's the problem here. There's a subtle difference between one condition and the other. And the preexisting condition is the osteoarthritis. In order to permanently aggravate that preexisting condition, whatever twisting has to aggravate the loss of the articular cartilage Dr. Carlson says that can't happen. If you have a meniscus tear, it's a meniscus tear. Go in and repair your meniscus. I'm sorry, I'll get it. Okay. I think I understand your theory here, is that the wearing of the articular cartilage is a different mechanism than what this accident produced in this gentleman, correct? Correct. Okay. And so that's your theory of this. And, Dr. Carlson, do you have anybody saying that structurally that that's different? Oh, yeah. Dr. Carlson did have that same opinion. He said that he has a preexisting condition which was not caused, aggravated, or brought about sooner by the work accident. Is there any medical opinion contra to that? Well, sure, Dr. Jimenez. You're right. And Dr. Jimenez, from your perspective, says what? Dr. Jimenez related the need for the knee replacement three years later to the September 22, 2015 accident. And the basis of Dr. Jimenez's opinion was his understanding that the petitioner was being freed prior to September 22, 2015. Wasn't he? No, he was not. Because if you take a look at the emergency room report from Ingalls, which is in the record, and the notes from Dr. Ishtar, the emergency room doctor, which is in the record, he gave the history to Dr. Ishtar Ingalls on the day of the accident. I have that pain and aching in my right knee for the year prior to the accident. And he also testified to that at our arbitration. He was not pain-free prior to September 22, 2015. By his own testimony. He was working, taking no medication, seeing no doctors, treating, nothing like that. He just acknowledged it. That's correct. He did not seek medical treatment. He was not pain-free. Before you lose all your time, I'm befuddled by your argument as to the credit. I'm befuddled by your argument as to the credit you claim you're entitled to, $56,282.20. It was the amount stipulated by the parks. You make the argument, don't even refer to the statute that covers the credit you're entitled to. The statute you're entitled credit to had to be quoted by your opponent. And it specifically says, now we understand the man was given the salary, 100% of his salary in the sum of $56,282.20. That's what he got paid. But the statute says, any salary compensation due the injured person from workers' compensation or any salary due him from any part of insurance which may have been carried by the employing public entity shall revert to that entity during the term for which continuing compensation is paid. The only thing you were ever entitled to was the $49,429.12 that you should have been paid in TTD. I don't understand your argument, how you can make the argument without even recognizing the statute. But my argument is based on what the parties stipulated to the amount. Well, they stipulated that he got paid $56,282.20, we know that. But you're not entitled to credit for what he got paid. You're only entitled under the statute to credit for what he should have been paid in TTD. That's all you get, or insurance, and there is no insurance here. Okay. My response is simply based on what was stipulated to that amount. Stipulated to that amount of what? Credit? Yeah. Or they stipulated that that's what he got for salary. But that doesn't equal the credit. And second of all, if you're going to make an argument like this, don't you think you should at least refer to the statute that covers the credit that you're entitled to? Yeah, absolutely. Well, all right. Okay. The specific credit should have been $49,000. It was that amount. $49,000. Okay. The argument that my brother makes about the pension board decision being federal establishment, that was raised for the first time in the circuit court, the issue was raised for the first time on an appeal in a way, but more importantly getting to the merits of that argument, the pension board decision dealt only with whether the petitioner was injured while he was on active duty and whether he could go back to his pre-exit employment. They only mentioned email placement. They don't mention call and connection. Completely different issues. It's not political stuff. Your time is up, but you'll have time in group five. All right. Thank you. Good morning. Before I start answering Justice Hudson's question about what was the holding of Cisco, the holding in that case, which is just a brief case 17, I think the important holding is the weight to be given to an expert's opinion. There's a letter from the commission to the side, and in that case the content of the treating doctor's letter did not justify the circuit court's ruling. In that case, the treating doctor said, hmm, I'm having trouble saying what was causative. We don't have that here. We have Dr. Jimenez, the treating doctor who saw him for two years, who consistently and unequivocally said that the injury, which is falling into a covered hole, not just uneven ground, it was a hole that was covered with grass, aggravated his degenerative condition. The end. So the other doctor who saw him, the contrary opinion that was given was by Dr. Carlson, who saw him after five minutes and said, didn't even examine him, didn't have all of his records, and said otherwise. I'm very impressed with my opponent's presentation. He's very emphatic. He's very passionate. Very passionate. Very nice delivery. Look, there's nothing to it. This is a case of manifest way of the evidence. Well, what about his argument that the claimant, though, would continue to experience pain even after the first accident was allegedly resolved? It's accurate. Plain and simple. In my brief, I saw it on page four. He said he participated in his regular exercise program. The man was running two or three miles two or three times a week. He was lifting weights five times a week. He took no medication for his knee. Didn't see a doctor about it. Never made a claim for power. And he testified that he experienced some soreness of the knee from time to time from working it out, and he stretched it out. And he took no time off work until the second accident? That's not to say he was in, my opponent said he was in pain. I don't know. What does stretch it out mean? So he's self-diagnosing himself and saying that that pain in my right knee is not joint pain, the wearing of the bones, again, you know, wearing out fat, whatever it is. Okay? It's just basically I, you know. So what's that worth? Well, you just said stretch. Well, a stretch is a muscle. Well, he was sore. He, after exercising, did say, ooh. So he's attributing self-diagnostically his soreness in his right knee to muscular. I don't think you can make that. He doesn't attribute it to anything. He doesn't think it's very severe. He doesn't think it's... But we have a medical opinion that's suggesting otherwise. The trained doctor is saying, hmm. That's pretty symptomatic of a progression of a wearing out of this two bones against each other. Mr. Torino said he had soreness of his knee from time to time from working out. He didn't say it was significant or severe. If it was, I think he wouldn't have gone to a doctor or maybe nobody. He's not diagnosing himself one way or the other. And the arbitrator found him credible. And the commission adopted the arbitrator's findings. So in this case, the question is, yeah, sure. There was a doctor who said this wasn't related. But can you set aside the commission's finding with the ruling that the rule of the standard is where the clearly evident, plain, and indisputable weight of the evidence compels an apparent opposite conclusion? Yeah, we've got those words called clearly and indisputable. That's why we're here. Is that true? Clearly and indisputably supports the other conclusion. The commission has the right to pick who it was. Can it pick the trained doctor from the low-lymphoma joints who has seen the guy for two years regularly on a monthly basis or should it go with the guy who sees him for five minutes and doesn't examine him? So that rises to the level of clearly and indisputable in your mind? It doesn't. His position does not rise to the level of clearly and indisputably. It would have to be his fact that rises to that level. And Dr. Carrickson's five-minute examination makes it such. We always say that. But in reality, I don't think we apply it. In any case, I don't think they can meet that. There was a finding by the arbitrator of the commission that Mr. Kabila was a credible witness who detailed the history of his first injury and his recovery. There's no reason to assume otherwise. In the face of some good, Justice Hoffman certainly understands the credit issue. My opponent was silenced when Justice Hudson asked him essentially to deceive the court. He switched topics. I don't – actually, what I'm supposed to argue with is not in my brief about something that was raised in the circuit court. My brief has two points. Two points. It's just those other points. There's no manifestation of the argument. The finding for them and the credit strike. I've got nothing else. Thank you. Thank you. Thank you. Counsel, you may reply. Very briefly. The 800-pound load is your Cisco decision. And regardless of what doctor says what, whether they're a treating doctor or an examining doctor or whether they're for the accountant or the appellee, they don't trump an appellate court decision no matter what the doctor says. Now, they have an opinion. Someone else has an opinion. And you deal with this all the time. You may have a commission picking Dr. A over Dr. B. Whoever had Dr. B come in front of you and said, well, they should have done this. Well, unless they can demonstrate to you that the opposite conclusion is clearly apparent, you affirm the commission. It's meant to be a high standard, but it's not meant to be insurmountable. When the record supports that, you reverse the commission all the time. And in this case, you have a treating doctor saying he was pain-free before the accident. He was not, as you correctly noted in the record. And Cisco says, you know, the commission got it right. They're absolutely correct. A meniscus tear doesn't aggravate articular cartilage because they are different structures and they have a solid medical opinion that supports that. And your analysis in Cisco is the same analysis we should have here. In Cisco, the guy went back to the doctor a month later, years, three years later, for a condition with no known cause and which progresses on its own. Thank you. Thank you, counsel. Thank you, counsel Bowles, for your arguments in this matter. It will be taken under advisement in a written disposition.